**AFFIRM; and Opinion issued March 8, 2013.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-12-00942-CV

### KEVIN STACKS, M.D., Appellant

### V.

### MOLLIE AND JAMES JEFFERS, Appellees

**On Appeal from the 397th District Court**
**Grayson County, Texas**
**Trial Court Cause No. CV-11-1716**

# MEMORANDUM OPINION

Before Justices Francis, Murphy, and Evans
Opinion By Justice Murphy

Kevin Stacks, M.D. appeals the trial court's denial of his chapter 74 motion to dismiss Mollie

and James Jeffers's health care liability suit arising from the death of their daughter, Jami Jeffers.

*See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351 (West 2011). In a single issue, Stacks contends

the expert report is conclusory and wholly deficient. We affirm.

## BACKGROUND

Jami Jeffers was admitted to Wilson N. Jones Memorial Hospital on Christmas day of 2009

and died of cardiac arrest in the early morning of December 26. The Jefferses sued the hospital,

Stacks, and physician assistant Debra Knightstep, alleging they were negligent in the care and

treatment of Ms. Jeffers. Among their allegations, they claimed Stacks, the emergency room

physician who saw their daughter, misdiagnosed her with pneumonia and admitted her to the clinical decision unit (CDU), the area of the hospital providing "the lowest level of care"; as a result, her condition deteriorated quickly, and she died of cardiac arrest.

The Jefferses filed an expert report by W. Frank Peacock, M.D. within 120 days of suing Stacks, *see id.*, to which Stacks objected and filed a motion to dismiss. *Id.* § 74.351(b). The trial court denied the objections and the motion to dismiss in a single order. Stacks filed this accelerated appeal.

## DISCUSSION

### *Applicable Law*

The Jefferses were required to comply with the expert-report requirements of chapter 74 of the Texas Civil Practice and Remedies Code to proceed with their health-care liability suit. *See id.* § 74.351; *Stockton v. Offenbach*, 336 S.W.3d 610, 614 (Tex. 2011). Specifically, section 74.351 requires that, within 120 days of filing an original petition, a claimant must "serve on each party or the party's attorney one or more expert reports" that provide a fair summary of the expert's opinions regarding applicable standards of care; how the claimant's physician or health care provider failed to meet the standards; and the causal relationship between that failure and the injury, harm, or damages claimed. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a), (r)(6); *Key v. Muse*, 352 S.W.3d 857, 859 (Tex. App.—Dallas 2011, no pet.). A report is sufficient to meet the requirements of chapter 74 if it represents "an objective good faith effort to comply with the definition of an expert report." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(l); *Bakhtari v. Estate of Dumas*, 317 S.W.3d 486, 489 (Tex. App.—Dallas 2010, no pet.).

The report must satisfy two purposes to constitute a good-faith effort. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001); *Bakhtari*, 317 S.W.3d at 496. First,

the report must inform the defendant of the specific conduct the plaintiff has called into question. *Palacios*, 46 S.W.3d at 879. Second, and equally important, the report must provide a basis for the trial court to conclude that the claims have merit. *Id.* A report that merely states the expert's conclusions about the standard of care, breach, and causation does not fulfill these two purposes. *Mosely v. Mundine*, 249 S.W.3d 775, 780 (Tex. App.—Dallas 2008, no pet.). An expert must explain the basis of his or her statements to link those conclusions to the facts. *Id.* This does not require the expert to marshal the plaintiff's proof, however; the report may be informal, and the information need not meet the same evidentiary requirements for summary judgment proceedings and trials. *Bakhtari*, 317 S.W.3d at 496.

## Standard of Review

We review a trial court's ruling on a motion to dismiss under chapter 74 for an abuse of discretion. *See Jernigan v. Langley*, 195 S.W.3d 91, 93 (Tex. 2006) (per curiam); *Key*, 352 S.W.3d at 859. Under that standard, we may not substitute our judgment for that of the trial court. *Walker v. Packer*, 827 S.W.2d 833, 839–40 (Tex. 1992) (orig. proceeding). The test for determining an abuse of discretion is whether the trial court acted without reference to any guiding rules and principles. *See Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). Stated differently, a trial court abuses its discretion if its decision is arbitrary and unreasonable. *Id.* at 242. A trial court has no discretion in determining what the law is or applying the law to the facts. *Walker*, 827 S.W.2d at 840.

## Analysis

Stacks argues the trial court abused its discretion in denying his motion to dismiss because Peacock's stated opinions are conclusory regarding the standard of care owed by Stacks, his alleged breaches, and the causal relationship between the alleged breaches and Ms. Jeffers's death. Because

the only information relevant to our inquiry regarding the adequacy of Peacock's report is that information within the four corners of the document, *Palacios*, 46 S.W.3d at 878, we begin by reviewing the report in some detail.

Peacock provides a time line in his report and a summary of facts. He notes that "Ms. Jeffers presented on Christmas day with what initially seemed to be a URI. However, the evaluation did not support the presence of a URI." He explains that Ms. Jeffers's "HR and tachypnea exceeded that which would be expected based on the documented physical exam, her lack of fever, and the lab and radiographic investigations." He reports that Ms. Jeffers was also "profoundly hypoxic," and "[b]ecause of the cardiovascular reserve present in a young patient, if a 29 year old is severely hypoxic, the radiographic findings should be remarkable." He adds that "[t]he fact that this patient had relatively little chest x-ray and CT findings (per the report) should have immediately called into question the possible diagnosis." Peacock also observes that as Ms. Jeffers' condition deteriorated, no changes occurred in the management or investigation of her condition. He states that the severity of Ms. Jeffers's illness when she arrived in the CDU "should have been an exclusion criteria for this unit"; yet despite her worsening condition, she "essentially received no additional evaluation or treatment until minutes before her death." He opines that when Ms. Jeffers's "blood gas [was] showing 51 mmHg oxygen (despite being on 6 liters of nasal cannula oxygen), immediate transfer to an ICU should have occurred. By waiting until her cardiovascular collapse, she was insured no potential for salvage[a]bility."

Peacock describes separately for Stacks, Knightstep, and the hospital (through the CDU nursing staff) the standards of care, the breaches of those standards, and the causal relationship between the breaches and Ms. Jeffers's death. Regarding the applicable standard of care for Stacks, Peacock states Stacks was required to:

-4-

1. Provide a reasonable and thorough evaluation of the patient's presentation and to recognize that the severity of her illness was a contraindication to CDU admission.

2. Make a diagnosis consistent with the patient's presentation and recognize an incomplete CT report as an impediment to an accurate clinical evaluation and diagnosis.

Stacks breached theses standards, according to Peacock, by his:

1. Failure to evaluate, diagnose and properly admit a patient with this severity of illness. Ms. Jeffers was labeled as having pneumonia, which to be consistent with the severity of her symptoms, would have had to have been remarkably obvious to cause such profound hypoxia in a 29 year old, otherwise healthy patient. Ms. Jeffers should never have been admitted to an observation unit. And at what point she continued to deteriorate, transfer to an environment more suited for her management was indicated for the critical nature of her condition.

2. Incorrect diagnosis of her condition as pneumonia. The fact that the pneumonia diagnosis is questionable at best, is indicative that Ms. Jeffers was labeled with a diagnosis of convenience, rather than based on the results of the examination or results of investigations ordered. In addition, he failed to consider a hemodynamic cause for Ms. Jeffers' severe presentation.

In his causation analysis, Peacock opines that Stacks's breaches of these standards of care contributed to Ms. Jeffers's death. Specifically, he states that Stacks assigned an incorrect diagnosis and transferred Ms. Jeffers to an inappropriate level of care; her "admission to the lowest level of care unit in the hospital compromised her care and was directly responsible for the failures in addressing her clearly deteriorating condition"; and once it was known that Ms. Jeffers was "profoundly hypoxic with clear lung sounds, and questionable findings on radiographic investigation," her condition "should have prompted an inpatient monitored environment such as the ICU where more aggressive diagnosis and interventions could have progressed."

Stacks claims that Peacock gave only generalized statements regarding both the standard of care and applicable breach. He argues these statements are so general and conclusory that they fail

–5–

to provide Stacks with any specific information, as required by the supreme court, about what he should have done differently. *See Palacios*, 46 S.W.3d at 880. We conclude the statements, when read in the context of the entire report, are sufficient to satisfy the purposes of the expert report. *Bakhtari*, 317 S.W.3d at 496.

The stated standard of care for Stacks was to provide a reasonable and thorough evaluation of Ms. Jeffers's presentation, to recognize that the severity of her illness was a contraindication to CDU admission, to make a diagnosis consistent with the patient's presentation, and to recognize an incomplete CT report as an impediment to an accurate clinical evaluation and diagnosis. The report also details that a twenty-nine year old patient that is profoundly hypoxic should have radiographic findings that are remarkable. Peacock observes that Ms. Jeffers was "labeled as having pneumonia," which he describes as "a diagnosis of convenience, rather than based on the results of an examination or results of investigations ordered." Her severe hypoxia, along with relatively little chest x-ray and CT findings, should have immediately called into question the diagnosis, and Ms. Jeffers should never have been admitted into the observation unit. Instead, once Ms. Jeffers was found to be hypoxic, she should have been transferred immediately to an ICU, an inpatient monitored environment where more aggressive diagnosis and interventions could have progressed; additionally, Stacks should have considered a hemodynamic cause for Ms. Jeffers's severe presentation, which he described in his timeline and included Ms. Jeffers's severe deprivation of oxygen. The details in the report—along with the applicable standard of care—put both Stacks and the trial court on notice of the conduct complained of and provided specific enough information about what Stacks should have done differently. *See Palacios*, 46 S.W.3d at 880.

Stacks further complains that the expert report fails to define several words, including "presentation," "illness," "condition," "URI," "remarkably deteriorated," "observation unit," and

"profoundly hypoxic." He also argues that the expert report fails, among other things, to explain what constitutes a "reasonable and thorough evaluation"; to identify the criteria for a CDU admission as opposed to an ICU admission; and to identify the proper diagnosis for Ms. Jeffers's condition or what steps Stacks should have taken to make the proper diagnosis. Stacks cites no authority that requires medical terms of art to be defined in the expert report. The standard requires that the expert report provide only enough information to inform Stacks of the specific conduct called into question and provide a basis for the trial court to conclude that the claims have merit. *Id.* at 879. While we recognize the report could have included additional information as suggested by Stacks, we have already determined the expert report is specific enough to inform Stacks of the conduct called into question and give a basis for the trial court to conclude the Jefferses' claims have merit—which is all that is required at this stage of the litigation. We conclude the trial court did not abuse its discretion in denying Stacks's motion to dismiss regarding the standard of care and Stacks's alleged breach of that standard.

Stacks also attacks as conclusory Peacock's opinions regarding any causal relationship between Stacks's breach of the standard of care and Ms. Jeffers's death. He asserts Peacock uses only vague conclusions with undefined terms and does not explain how the placement of Ms. Jeffers in the observation unit compromised her care; how being in the observation unit caused the failures to address her deteriorating condition; what testing or treatment should have been ordered to address her condition; or what would have happened, in reasonable medical probability, upon a transfer to the ICU.

To satisfy the causation requirement, Peacock's report must include a fair summary of his opinion regarding the causal relationship between the breach of the standard of care and the injury, harm, or damages claimed. *Mosely*, 249 S.W.3d at 780. Whether the causation statements in the

report appear conclusory when read in isolation is not the test; rather, the trial court is entitled to consider the causation statements in the context of the entire report. *See Philipp v. McCreedy*, 298 S.W.3d 682, 690 (Tex. App.—San Antonio 2009, no pet.); *see also Bakhtari*, 317 S.W.3d at 496.

At oral submission, Stacks relied on *Ortiz v. Patterson*, 378 S.W.3d 667 (Tex. App.—Dallas 2012, no pet.), to argue that Peacock's report is conclusory as to causation. The expert report in *Ortiz* contained the following statement:

> [f]ailing to do the appropriate tests, make the correct diagnosis, and recognize the clinical severity and risks involved in not referring Mr. Ortiz for admission to a hospital did not meet the standard of care, and contributed to the premature death of this man. If Mr. Ortiz had received appropriate evaluation and treatment it is more likely than not that he would have survived this ordeal.

*Id.* at 673. We concluded this quoted language failed to explain how Mr. Ortiz's condition worsened from very ill to death as a result of the failure to conduct certain tests and admit him to a hospital. *Id.* at 675. Peacock's statements regarding causation are distinguishable, especially when read in the context of his entire report.

Peacock specifically describes the misdiagnosis of Ms. Jeffers's condition as pneumonia, when her condition did not support that diagnosis. He also focuses repeatedly on her admission to the lowest level of care unit in the hospital, which compromised the type of care she needed and contributed directly to the failure to address and treat her worsening condition. Peacock states that based on Ms. Jeffers's "profoundly hypoxic with clear lung sounds, and questionable finding on radiographic investigation," she should have been in a monitored environment such as the ICU. Peacock opines that because of these failures, Ms. Jeffers's hypoxia worsened, leading to "profoundly inadequate oxygenation and associated cardiac arrest and death." Peacock thus explained in his report how the failure to properly diagnose Ms. Jeffers's condition and place her in a closely monitored care unit allowed her hypoxia to worsen to the point that there was "no potential

for salvageability" when she was finally transferred to the intensive care unit. Unlike *Ortiz*, Peacock identified the underlying facts and linked his conclusions to those facts. *See Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002); *Baylor Med. Ctr. at Waxahachie v. Wallace*, 278 S.W.3d 552, 561 (Tex. App.—Dallas 2009, no pet.).

Whether statements in a report are conclusory depends on the unique facts addressed in the report. Compare the facts here, for example, with the facts and report in *Mosely*, in which we concluded an expert report was not conclusory as to causation. In *Mosely*, we determined that a failure to detect a one-centimeter-sized nodule in an x-ray resulted in a six-centimeter-sized mass in the lung that required surgery and chemotherapy. *Mosely*, 249 S.W.3d at 777. Had the mass been detected earlier, less invasive treatment would have been necessary and the chance of survival would have been greater with less invasive treatment. *Id.* at 781. We concluded in that case that the expert's opinion as to causation was not mere conjecture and speculation because it supported its statements with facts. *Id.* Similarly, we conclude the trial court did not abuse its discretion in denying Stacks's motion to dismiss regarding the causal relationship between his alleged breach of the standard of care and Ms. Jeffers's death. We overrule Stacks's sole issue and affirm the trial court's order.

_____
MARY MURPHY
JUSTICE

120942F.P05

–9–



# Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

KEVIN STACKS, M.D., Appellant

No. 05-12-00942-CV     V.

MOLLIE AND JAMES JEFFERS,
Appellees

Appeal from the 397th District Court of
Grayson County, Texas. (Tr.Ct.No. CV-11-
1716).
Opinion delivered by Justice Murphy,
Justices Francis and Evans participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is
**AFFIRMED**. It is **ORDERED** that appellees Mollie and James Jeffers recover their costs of
this appeal from appellant Kevin Stacks, M.D.


Judgment entered March 8, 2013.


MARY MURPHY
JUSTICE